PLANNING AND ZONING COMMISSION OF THE TOWN OF
MIDDLEFIELD ET AL. *v.* ZEMEL BROTHERS, INC., ET AL.

HON. AARON J. PALMER, A JUDGE OF THE SUPERIOR COURT
MIDDLESEX COUNTY, FILE NO. 20242

46

Memorandum filed July 27, 1970

*Sachs, Sachs, Giaimo & Sachs,* of New Haven, for the named plaintiff and the plaintiff town of Middlefield.

*Stephen S. Sweet,* of Middletown, for the plaintiff town of Middlefield.

*Jacobs, Jacobs, Grudberg & Clifford,* of New Haven, for individual plaintiffs and the plaintiffs The Lyman Farm, Inc., and Coginchaug Development Corporation.

*Belford & Belford,* of New Haven, for the named defendant, and the defendant Connecticut Finance Company, Inc.

*Saltman, Weiss, Weinstein & Elson,* of Bridgeport, for all defendants.

PALMER, J. This is an application for a temporary injunction heard by a judge of the Superior Court before the return day of the writ. For convenience, the judge will hereinafter be referred to as the court.

The plaintiffs are the planning and zoning commission of the town of Middlefield, the town of Middlefield, two corporations located in the town of Middlefield, and twenty-five individuals who reside in the town of Middlefield. Generally speaking, the

plaintiffs are seeking a temporary injunction enjoining the defendants from promoting or conducting a music or rock festival on premises of two of the defendant corporations in the town of Middlefield and from using two parcels of land of three individual defendants for the purpose of parking motor vehicles of the purchasers of tickets for the festival.

## I

Since the incorporation of the town of Middlefield in 1866 by the Connecticut General Assembly, the legislative body of the town has been the town meeting. A board of three selectmen is the town's executive authority, with power to superintend the affairs of the town. The area of the town is 13.2 square miles, and its population, according to preliminary figures of the 1970 national census, is 4050, of whom approximately 1700 are children. The character of the town is predominantly rural agricultural, and its system of roads and highways is characteristic of rural, agricultural areas. The roadway system consists largely of two-lane asphalt or macadam roads which are very curvy and circuitous. In addition, as the Middlefield terrain is generally hilly, many of the roads have steep grades.

In April of 1970, a special town meeting purported to enact a "special events" ordinance, for the purpose of regulating so-called music or rock festivals, whereunder the first selectman was empowered to issue licenses pursuant to the terms of the enactment. When the festival that is the subject of this proceeding started to germinate, the first selectman appointed an ad hoc advisory committee, presumably to advise and assist him in regard to granting or denying a license under the ordinance. There was no legal authority for the appointment of this committee, but it appears that it participated with

the first selectman as spokesman for the town in meetings with representatives of the promoters of the festival.

Another special town meeting purported to enact an amendment to the "special events" ordinance to strengthen its provisions. The first selectman and the members of the advisory committee acted thereafter on the assumption that the "special events" ordinance as amended was a valid and effective law. In fact, there is a very serious question as to whether the town of Middlefield had the legal power to adopt the original "special events" ordinance in April. The powers of towns like Middlefield, which do not have a charter, are governed by § 7-148 of the General Statutes, and that section does not appear to authorize the enactment of the ordinance in question. Furthermore, even if Middlefield did have the requisite statutory power, the amendatory ordinance was not published as required by law, and for that reason alone could not become effective. At the hearing, the plaintiff's attorneys recognized the invalidity of the ordinance and did not press the count based on it.

The defendant Middleton Arts International, Inc., hereinafter called Middleton, is a Connecticut corporation which was organized in June of 1970 specifically for the purpose of conducting a festival in this state. Middleton investigated three other locations in Connecticut, which proved to be unsuitable or unavailable for legal reasons. Middleton then investigated the Powder Hill ski area in Middlefield and decided it was the most desirable and usable of the sites investigated.

Thereupon Attorney Richard Zeisler, a member of the Bridgeport bar, in behalf of Middleton made a trip to the Middlefield town offices to obtain information. On June 10, 1970, Middleton signed an agree-

ment with the owners of the Powder Hill ski area for the use of the area for the festival. That same day Middleton hired Alan Scherr to be the producer of the festival, and by June 16 or 17 Scherr had hired the cast to perform at the festival. On June 24, he launched an extensive advertising and publicity campaign to publicize the festival among lovers of rock music. Included in the advertising were the words, ". . . we believe this is the important one for 1970."

In the meantime Attorney Zeisler and other representatives of Middleton met with the Middlefield first selectman and his advisory committee on Sunday, June 14, 1970, in Middlefield to discuss the festival. During this meeting the Middleton people said they would bring in experts to answer the committee's questions in regard to arrangements for the festival. On June 23, Attorney Zeisler filed an application for a license as required by the "special events" ordinance. This application set forth that the approximate number of people attending this event would be 25,000 to 50,000.

On June 24 and June 25, 1970, a massive advertising and publicity campaign started in the newspapers and radio. On June 25 Attorney Zeisler had a lengthy meeting with the first selectman and Trooper Leonard, the resident state policeman for Middlefield. Zeisler testified that they told him there was no objection to a festival so long as the defendants "could properly handle it." He also testified they suggested that the defendants start with a festival of 10,000. Attorney Zeisler also testified that during the June 25 meeting the first selectman received a call from the Associated Press and he said over the telephone in Zeisler's presence that he could not see any reason why the festival should not be held.

Another and final meeting was held on June 29, 1970, attended by the first selectman, members of the advisory committee, state police officers, the town zoning enforcement officer, the state commissioner of health, a New Haven attorney for the town of Middlefield, Attorney Zeisler and other representatives of Middleton, an attorney representing other defendants, Mr. and Mrs. Louis Zemel, and a reporter for the Middletown Press. At this meeting plans for the festival and parking areas were discussed at length.

Attorney Zeisler testified that the upshot of the June 29 meeting was that the town was very much impressed with the plans for the festival and that he got the impression the town was satisfied. He admitted, however, that he had a "fear of the unknown" and he said he was dismayed because the attorney for the town questioned whether their plans for parking would violate the zoning regulations. Zeisler also testified that Middleton had always operated on the basis of a 50,000 limit for attendance with 15,000 vehicles, but at the June 29 meeting Middleton offered to reduce the attendance to 35,000 to 40,000. The court received the impression that the conferences and communication between Middleton and the town spokesmen smacked of bargaining, with the town spokesmen trying to keep the attendance down as low as possible and Middleton trying to raise it as high as possible.

In any event Zeisler made no claim that any agreement or commitment to grant a license was made. At the June 29 meeting the attorney for the town asked him to submit a "write-up" of Middleton's plans, and such a "write-up" was mailed to the first selectman. Zeisler said they were told they would hear from the town in ten days. Middleton received no further word directly from the town, but on July

4 and 5 the request for an injunction was served on the defendants.

In their brief the defendants say that "it is clear that the defendants are on much stronger ground to invoke the sympathy of the court than the plaintiffs. This is so because the first selectman, even if not intending to do, clearly led the defendants to believe they would be justified in making the very substantial investment in the festival which they did prior to being served with the order to show cause."

There are at least two answers to this claim. The first and short answer is that the evidence does not support it. Meckley, the first selectman, did not clearly lead the defendants into believing that they would be justified in making substantial investments. Apparently Meckley was favorably disposed to the festival, provided it could be properly handled, but he never told Zeisler that he would issue a license for it. What they were doing was negotiating. Zeisler knew he did not have a definite yes. If, as the defendants claim, Meckley led Zeisler on June 25 to believe that Middleton would be justified to spend large amounts of money, why was it necessary to hold a large meeting of those concerned on June 29? Meckley may have given Zeisler reason for optimism, but he did not give him any reason to believe that he would definitely issue a license for the permit. He said nothing on which Zeisler could reasonably rely to justify large expenditures. Actually, starting around June 13 or 14, Scherr started to spend Middleton's money in large quantities for advertising and performers. This was long before June 25, when Meckley is alleged to have "misled" Zeisler. It appears from the evidence that Middleton was gambling that Meckley's favorable disposition to the festival would result in the issuance of a license.

The second answer to the defendant's claim is that, as all the parties to this action agree, the "special events" ordinance was admittedly invalid and ineffective. It follows that the first selectman and his advisory committee were totally without legal authority to negotiate or deal with the promoters on the assumption that he could license the festival, and whatever he or his committee said or did was wholly nugatory. It is the law that a "municipality cannot be estopped by the unauthorized acts of its officers or agents." *Hebb* v. *Zoning Board of Appeals,* 150 Conn. 539, 542. The fact that the invalidity of the ordinance was not known to the people involved is immaterial, as ignorance of the law is no excuse. This is particularly true in the case of an attorney, which Zeisler was. In point of fact it would not have been very difficult for him to have ascertained that the ordinance was not valid or effective.

## II

At the hearing the plaintiffs established that the defendants proposed to conduct a music festival on July 31, August 1, and August 2, 1970, at the Powder Hill ski area in Middlefield with a planned attendance of 50,000 persons who were to arrive in 15,000 motor vehicles. The plaintiffs claimed, among other things, that the roadway system and the parking areas to be provided for incoming cars were inadequate to handle 50,000 persons and 15,000 vehicles and that the holding of the festival would create an inconvenience and danger to the community to the extent that it would constitute a nuisance which ought to be enjoined by the court. Without question the plaintiffs made out a very strong prima facie case for the issuance of an injunction, one that required strong rebuttal by the defendants.

Rather than attempt to rebut the plaintiffs' strong prima facie case in respect to an attendance of 50,000

and 15,000 motor vehicles, the defendants' defensive maneuver was to propose a plan that would limit attendance to 20,000 persons with an estimated 6,500 vehicles. The defendants take the position that thereupon the burden of proof was on the plaintiffs to show that this plan would create a nuisance. The court cannot agree that the plaintiffs had any such additional burden. If this were so, the defendants could propose any number of plans, and in respect to each of them require the plaintiffs to go forward with a new burden to establish that each plan proposed would result in a nuisance. Such a situation would be intolerable. In the court's view the plan to reduce attendance is a matter of defense, and, of course, the burden of proving all matters of defense rests upon the defendants. 43 C.J.S. 885, Injunctions, § 190. Accordingly, the court holds that the burden of proving that a limited attendance of 20,000 persons would not result in the creation of a nuisance is upon the defendants.

The proposed festival is not a nuisance per se in and of itself. The proposed site can readily accommodate 50,000 people to listen to music. The festival is not a nuisance because of the life styles of the young men and women who are likely to attend it. The plaintiffs have made no claims to this effect, and the habits and morals of these young people are of no concern to the court in this proceeding, since they are not issues before the court. Conceivably there is an attendance limit which would not result in the creation of a nuisance. There was mention in the evidence that an attendance of 10,000 would be satisfactory. The court, however, is precluded from considering any limitation of attendance below the figure of 20,000 because at least 20,000 tickets have been or will be sold. The court is confronted with the choice of limiting the attendance to 20,000 or prohibiting the festival entirely, and the decision

depends on whether the defendants have met their burden of persuading the court that an attendance limited to 20,000 would not result in the creation of a public nuisance.

In the opinion of the court an attendance of 50,000 people arriving and departing in 15,000 motor vehicles would result in an inundation of the town of Middlefield of catastrophic proportions. The result of an attendance of 20,000 persons, however, is not entirely free from doubt. The first selectman of Middlefield, a responsible person who has been very close to the situation since its inception, testified that if the attendance was limited to 18,000 or 20,000 he would approve the festival. He later modified this statement by saying that if there was a guarantee that not more than 18,000 would attend, he would approve, and he indicated his concern that more than that number would come to the festival.

The court is also concerned with the number who would be likely to attend if the festival is permitted with an attendance limited to 20,000 by judicial edict. The court is not unaware of the physical characteristics of the young men and women to whom such a festival would have great appeal. They are mobile and energetic. They are resourceful and peripatetic. The evidence disclosed that the promoters budgeted $50,000 in advertising for the festival and that a highly professional and sophisticated advertising campaign was mounted—in regular newspapers, so-called underground newspapers and on radio stations—which was designed to reach the people for whom a festival of the type planned has tremendous appeal. In addition, very well-known and very expensive performers in the rock music world have been contracted for at an expense of approximately $300,000. The court is fully satisfied that rock festival devotees in the many, many thousands

have received the message intended for them by the advertising campaign and would come to the festival even without tickets or the possibility of purchasing tickets. To say otherwise would be to close one's eyes to the facts of the contemporary world in which we live. There have been too many instances where such a situation has developed.

At the hearing the defendants recognized the likelihood that a large number of young people without tickets would attempt to gain unauthorized admission to the festival site, and they presented evidence intended to persuade the court that they have worked out a system of security which would effectively prevent such persons from entering or attempting to enter the festival premises. The court has considered this evidence with great care, since it is crucial to the defendants' plan for a limited attendance, and has concluded that the defendants' security preparations will not function effectively to prevent unauthorized persons in very large numbers from gaining admission to the site premises. The defendants' security plans are tentative, incomplete, hypothetical and untested. They require extensive cooperation by the police authorities, and no evidence of any kind was presented in court that the police, whose aid in great quantity would be required in order to implement the defendants' security plans, had even been consulted in respect to the plan presented in court.

The court is equally concerned with the traffic upon the Middlefield highway system which will be generated by a three-day festival. During the course of the five-day hearing, the court at least twice drove over every road in the vicinity of the festival site which could possibly be used by either pedestrians or vehicles on the way to the festival, and over each road mentioned in the testimony at least three times.

It is a fair estimate from the Middlefield population figure of 4050 that at least 2000 motor vehicles are owned by the residents of Middlefield. Even if it be assumed that only 20,000 persons would attend the festival, that would involve 6500 cars. And if, as appears likely, many additional thousands of persons chose to come without tickets, the presence of many, many more vehicles must be anticipated. It is perfectly clear to anyone with normal knowledge-ableness that the presence of so many people and so many cars on the roads of Middlefield would precipi-tate a monumental traffic jam which would seriously endanger the community unless it could be demon-strated that a plan had been effected to handle and regulate this traffic in such a manner as to remove the apparent and evident dangers inhering in the very presence of so many people and so many auto-mobiles in the Middlefield area.

During the hearing the defendants recognized this problem and attempted to solve it by the testimony of a traffic expert who outlined a plan for handling traffic to and from the festival site and to and from parking areas to be provided for the motor vehicles which would be driven into the area by persons planning to attend the festival. The court considers the testimony of this witness utterly unrealistic and incredible and is convinced beyond question that the witness' plan would not work and that chaos would result if it were put into effect. This witness, too, assumed that the state police would do what-ever he deemed to be feasible, even though he had made no attempt to confer with them in regard to his plan.

In the opinion of the court the defendants have not proved that their proposal to limit the festival attendance could be carried out without substantial danger to the residents of Middlefield that they

might be deprived of access to their roads in the event of emergency situations. The roads of a community are its lifelines. No matter how large an enterprise may be or however desirable it may be from an artistic, cultural or financial viewpoint, it must not be permitted to endanger the life of one solitary human being.

While the court has placed on the defendants the burden of proving that the plan for an attendance of 20,000 would not result in a nuisance, it is only fair to say that even if the burden was placed on the plaintiffs to prove that the plan would result in the creation of a nuisance, upon all the evidence they have sustained that burden.

The court quotes with approval from a 1970 decision of the Supreme Court of New York in a case very similar on its facts to the case under consideration, as follows: " 'It is a general rule of law that every person may exercise exclusive dominion over his own property and subject it to such uses as best subserve his interests, and no other person shall say how he shall use or what he shall do with his property. However, this principle is subordinate to another, which finds expression in the familiar maxim . . . that every person may make such use as he will of his own property, provided he uses it in such a manner as not to injure others. . . .' (42 N.Y. Jur., Nuisances § 10.) In balancing the equities there must be considered the rights and the interests of the defendants in conducting the proposed event, on the one hand, and, on the other hand, the serious consequences of permitting the defendants to conduct the proposed event in the particular surroundings and location they have chosen; the inconvenience and danger imposed upon the community by having important roads and highway[s] blocked with crowds of people; . . . the potential drain . . . upon sheriffs' personnel, of men needed . . . for the

performance of their regular duties. The potential for harm to the community, the public, far outweighs any good which may be derived from such an event." *Town of Preble* v. *Song Mountain, Inc.*, 308 N.Y.S.2d 1001, 1013.

The court concludes and finds that the rock music festival that the defendants propose to conduct on July 30, July 31 and August 1, 1970, with an attendance limited to 20,000 persons would, if conducted, interfere substantially with the rights of the general public in the vicinity, would obstruct the exercise of rights common to all, and should be enjoined as a public nuisance.

## III

The plaintiff planning and zoning commission seeks to enjoin the festival on the separate ground that it will contravene the zoning regulations of the town of Middlefield. The defendants question the validity of the zoning regulations. The court, however, is satisfied that the ordinance voted at the town meeting on January 12, 1961, adopting zoning for the town of Middlefield, was legally enacted, and the court is also satisfied that the planning and zoning commission adopted zoning regulations which became effective on September 18, 1961, in accordance with legal requirements. There is a presumption of law that public officers, acting officially, properly performed their duties. In the absence of evidence to the contrary, the court can assume that the town of Middlefield and its officials acted in accordance with law in adopting zoning regulations. *Scovil* v. *Planning & Zoning Commission*, 155 Conn. 12, 19; *Aczas* v. *Stuart Heights, Inc.*, 154 Conn. 54, 59; *State* v. *Lenihan*, 151 Conn. 552, 555. The defendants have failed to rebut this presumption, and the zoning regulations must be considered as having been validly enacted.

The defendants, however, advance two arguments for invalidating the zoning regulations, neither of which relates to enactment procedures or the publication of notices as required by law. The first is that the town failed to deposit a compilation of its ordinances in the Middlesex County bar library and in the courthouse library of the Circuit Court in the ninth circuit, as required by § 7-148a of the General Statutes. The obvious purpose of this statute is to make the ordinances of municipalities in this state more available to the public. It is directory and not mandatory, and the admitted failure of Middlefield to comply in no way invalidates the Middlefield zoning regulations. The court would hazard a considered guess that this statute is honored much more in the breach than in the observance.

The defendants' second contention is that the zoning regulations are invalidated because of noncompliance with § 7-4 of the General Statutes, which provides that the person who posts, causes to be published, or in any other manner gives notice of the warning of any town meeting shall make return, in writing, to the person whose duty it is to keep a record of such meeting, showing the notice given of such warning. In 1887 the United States Supreme Court decided that the town of Bloomfield, Connecticut, could not be charged with the neglect of its officers to file or record a sufficient notice of a town meeting. The court said it is the neglect of the officers and not the town. *Bloomfield* v. *Charter Oak Bank,* 121 U.S. 121, 137. Furthermore, the court believes that the requirement of the statute is directory and not mandatory. The Supreme Court of this state has held that the failure of a zoning commission to state on its records any reasons for a change of zone as required by statute does not void the zone change. *Nielson* v. *Zoning Commission,* 149 Conn. 410, 411; *Woodford* v. *Zoning Commission,*

147 Conn. 30, 32. The statutory requirement is directory only. *Corsino* v. *Grover,* 148 Conn. 299, 310. Failure to comply with the requirement that a zoning commission state on its records the reasons for a change of zone is obviously much more serious in its nature than the failure to make a return showing the notice given of a warning of a town meeting. As the former requirement is merely directory, so must be the latter.

The Middlefield zoning regulations are perfectly valid and must be accorded their full force and effect. The land of the defendant owners upon which the festival is to be conducted is located in an agricultural AG zoning district, and the permissible uses in such a zoning district do not permit the use of land for the proposed music festival. Middlefield Zoning Regs. § IV (1).

An attempt was made at the hearing by the defendants to establish the existence of a nonconforming use of the land in question which would permit the planned music festival. The court does not deem it necessary or advisable in this proceeding for a temporary injunction to attempt to make any adjudication in regard to whether there is an established nonconforming use of the proposed festival site or any part of it, and if so, the nature and extent of such nonconforming use. Such a determination is better left to another proceeding between the concerned parties, if that should prove necessary. But as far as this proceeding is concerned there can be no possible legal question that if there is indeed a legal nonconforming use of the proposed festival site land, it does not even remotely reach the dimensions which a three-day music festival entails. The court holds that there is no nonconforming use which would permit the planned music festival.

The zoning regulations permit the use of land or buildings in any zoning district, subject to obtaining a special permit from the planning and zoning commission, for "participating in or attendance at outdoor sports and recreational/or cultural activities." Middlefield Zoning Regs. § VIII (7) (f) (1), as amended January 7, 1970. The plaintiffs do not argue that an outdoor music concert is not a "cultural activity" and therefore might not be the subject of a special permit.

It is clear from the evidence that the owners of the proposed festival site did not make any application for a special permit, as required by the regulations, in the ordinary and accepted meaning of the word "application," and it is agreed by all that no special permit was ever granted. Nevertheless, the defendants argue that there was "de facto compliance with the way things are done in the small Town of Middlefield" and that "the request should be considered as having been made under the ordinance in accordance with Middlefield's standards of making requests." They further say "that the bringing of the action to enjoin the festival is a Middlefield equivalent of a denial" and "the determination of whether or not the injunction should be granted is a Middlefield equivalent of an appeal from an adverse ruling of the Planning and Zoning Commission." The court cannot accept such abstruse reasoning as the basis for a legal determination. The plain and simple facts are that no application for a special permit was ever made and no special permit was ever granted. The informalities and laxities of Middlefield's procedures cannot affect or change those facts.

The court finds that the proposed festival clearly would violate the Middlefield zoning regulations. Most of the principal figures in this controversy can share the blame for this situation. Louis Zemel, the

principal representative of the two defendant corporations who own the land in question, has exhibited a very relaxed attitude toward the zoning regulations. He has paid them no heed, almost as if he thought they would quietly go away. He must have represented to the promoters that the land was legally usable for the purpose of conducting a festival, and apparently they made the serious mistake of relying on what Zemel told them. Of course, they could and should have checked on the zoning regulations, but there is no evidence that they did so.

Meckley, the first selectman, is by law an ex officio member of the planning and zoning commission, but so far as the evidence shows it never occurred to him to bring the subject up. An attorney for the town did so on June 29, 1970. Even if the "special events" ordinance had been valid, the first selectman could not legally have issued a license for a special event, such as this festival, which would violate the zoning regulations. Meckley had neither the legal power nor the authority knowingly or unknowingly to override the town's zoning regulations, and the planning and zoning commission is not estopped to assert them, even if Meckley was first selectman, chief of police, and town agent.

At this point in time the only effective method to uphold the integrity of the zoning regulations is to issue an injunction restraining the defendants from conducting the proposed festival. The amounts of the fines provided by law for zoning law violations are a mere pittance compared to the potential profit from the venture. Section 8-12 of the General Statutes authorizes an injunctive proceeding to prevent such violations, and even in the absence of such a statute a court of equity may render injunctive relief. *Darien* v. *Webb,* 115 Conn. 581, 588; *Coombs* v. *Larson,* 112 Conn. 236, 244.

## IV

In oral argument at the conclusion of the hearing the attorney representing the Zemel interests made the claim that if an injunction is granted it will deny the first amendment right of peaceful assembly guaranteed by the constitution of the United States. This claim is wholly without merit, and indicates a misconception of the scope and ambit of that constitutional right.

Insofar as it is relevant to this claim, the first amendment provides: "Congress shall make no law . . . abridging . . . the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." Zemel apparently is attempting to assert the rights of those who wish to attend the festival. They are not parties to this action and their rights cannot be adjudicated here. It may be noted that the evidence did not disclose any intention by Zemel or anyone else to petition the government for a redress of grievances. Zemel may assemble as many people as he wishes on his property for any lawful purpose, provided always that such an assemblage does not constitute a nuisance and further provided it does not violate zoning regulations. In this case the assemblage is being enjoined because it does both. The constitution does not authorize unlawful activities.

## V

During the hearing there was evidence concerning the promoters' plans for the availability of food, medical services and sanitary facilities. The court has seen fit to make a determination in regard to injunctive relief on other grounds, but this is not to be taken as any approval by the court of the proposed plans for food distribution, medical services or sanitary facilities. The court simply does not

express any opinion one way or the other in regard to them, and this should be clearly understood in the event of future proceedings.

## VI

The court finds that the plaintiffs would suffer irreparable injury if an injunction is not granted and that they have no adequate remedy at law. *Gorham* v. *New Haven,* 82 Conn. 153, 157. If they are to have any effective relief, it can only be now in the form of injunctive process.

## VII

In both oral argument and written briefs, the defendants have pressed the contention that a festival with an attendance limited to 20,000 persons ought to be permitted because, if the festival is enjoined entirely, large numbers of persons may come into the area and become unmanageable, whereas if a festival limited to an attendance of 20,000 is permitted by the court "the elaborate precautions and machinery of the defendants" would be functioning to control the crowd. They say that if the festival is enjoined, "there might be a serious risk that a large group of frustrated young people will descend on Middlefield," but if 20,000 are permitted to attend, then the state police will have the benefit of the efforts of the "defendants' staff."

These claims can only be characterized as a form of argumentative blackmail. They constitute a threat that if the court does not permit a festival with an attendance limited to 20,000, then terrible things may happen that will be worse for the area than if the festival is held on the terms the defendants desire. It ill behooves people who propose to create a nuisance to say that unless they are permitted to do so, a worse situation will result. If that proves to be the case, the defendants have put into motion the forces that bring it about.

Of course, the court must reject this argument as unworthy. The plaintiffs' legal rights cannot be ignored or neglected because of the possibility or even the likelihood that their enforcement by the court will create difficulties. The court has no way of knowing what will happen, but the court has every confidence that the police authorities in this state will do everything humanly possible to control the situation and to minimize any difficulties which may arise.

## VIII

Two of the important witnesses in this proceeding are lawyers—Frederick G. Adams, of Middlefield, who testified in behalf of the plaintiffs, and Richard D. Zeisler, of Bridgeport, who was a witness for the defendants. Each of them was scrupulously honest in his testimony, and the court wishes to commend each of them for adhering to the highest standards of the bar of this state.

## IX

An order of injunction may issue commanding and enjoining the defendants as follows:

## (A)

Commanding and enjoining the defendant Middleton Arts International, Inc., its agents, servants and employees, under penalty of $50,000, as follows:

(1) From staging, holding, operating or conducting a musical festival or rock festival or concert in the town of Middlefield at the Powder Hill or Powder Ridge ski area on July 31, August 1, and August 2, 1970.

(2) From further advertising, publicizing or promoting such a festival or concert.

(3) From selling, distributing, giving away or providing tickets for such festival or concert.

(4) Requiring said defendants immediately to notify the artists who were to perform that such concert or festival has been canceled and that they will not be allowed to perform thereat.

(5) Requiring said defendants immediately to notify other persons who were to have come to the site of the concert or festival to perform services either as employees or independent contractors that their services will not be required or permitted in preparation for such concert or festival.

### (B)

Commanding and enjoining the defendants Zemel Brothers, Inc., and Connecticut Finance, Inc., their agents, servants and employees, under penalty of $50,000, from allowing or permitting their lands and buildings in the town of Middlefield known as the Powder Hill or Powder Ridge ski area to be used for staging, holding, operating or conducting a musical festival or a rock festival or concert on July 31, August 1, and August 2, 1970.

### (C)

Commanding and enjoining the defendants Alfred S. Drezek, Edward Drezek and Charles Drezek, their agents, servants and employees, under penalty of $10,000, from using or permitting anyone to use their lands in the town of Middlefield for the purpose of parking motor vehicles in conjunction with a musical festival or a rock festival or concert at the Powder Hill or Powder Ridge ski area in Middlefield on July 31, August 1, and August 2, 1970.

Counsel for the plaintiffs are requested to submit to the court a form of injunction in accordance with the foregoing.

### X

Section 52-472 of the General Statutes provides that no temporary injunction shall issue in any case until the party making application therefor gives

bond, with surety satisfactory to the court or judge granting the injunction, to the opposite party, to answer all damages in case the plaintiff in the action in which the injunction is applied for fails to prosecute the action to effect. The amount of the bond rests in the discretion of the court. The facts, circumstances and background of this case are very well known to the court, and after careful consideration of them the court feels it is reasonable to require the plaintiff town of Middlefield to furnish a bond in the amount of $25,000, in conformity with the statute, before the injunction shall issue.